**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

FILED
AUG 06 2008

CLERK OF CIRCUIT COURT
THIRD JUDICIAL CIRCUIT COURT #68
MADISON COUNTY, ILLINOIS

|  |  |  |
|---|---|---|
| SHANE PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. *08-562-JPG* |
| | ) | |
| REV. ROBERT JOHNSTON, and | ) | |
| THE CATHOLIC ARCHDIOCESE OF | ) | |
| ST. LOUIS, a religious corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF REMOVAL

Defendant Archdiocese of St. Louis (hereinafter "Archdiocese"), by and through its undersigned attorneys, gives notice of its removal of this action to the United States District Court for the Southern District of Illinois, East St. Louis Division, pursuant to 28 U.S.C. §1441, and states as follows:

1.      On or about June 30, 2008, Plaintiff, Shane Perry ("Plaintiff") commenced this action by filing a Complaint in the Circuit Court of the Third Judicial Circuit, Madison County, Illinois, denominated as Case No. 2008-L-000588. Plaintiff's Complaint contains six (6) common law claims against Defendants stemming from the alleged sexual abuse of Plaintiff.

2.      The Archdiocese was served with process on July 15, 2008. Therefore, pursuant to 28 U.S.C. §1446(b), this Notice of Removal is timely filed within 30 days of service of process.

3.      Other than Plaintiff's Complaint, no other papers, pleadings, process or orders have been served on the Archdiocese in connection with this action, and no proceedings have been had in the Circuit Court as of the filing of this Notice of Removal. Pursuant to 28 U.S.C.

§1446(a), a copy of the Complaint is attached hereto as Exhibit "A" and incorporated herein by reference.

4.      Neither the Archdiocese nor its attorneys have entered an appearance, filed any responsive pleadings, or filed any papers responding to Plaintiff's Complaint in the Circuit Court.

5.      This Notice of Removal is being filed in the United States District Court for the district in which the action is currently pending pursuant to 28 U.S.C.A. §1441(a).

6.      This Court has original jurisdiction over this case pursuant to 28 U.S.C.A. §1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of treble damages, costs and attorneys' fees.

7.      Plaintiff is a resident and citizen of the State of Illinois.

8.      The Archdiocese is a Missouri non-profit corporation with its principal place of business in St. Louis, Missouri. Therefore, for purposes of diversity jurisdiction, it is a citizen of Missouri.

9.      Defendant Johnston is also a resident and citizen of the State of Missouri.

10.     Plaintiff brings this action under a number of common law tort theories arising from alleged sexual abuse. Among Plaintiff's alleged damages are multiple medically diagnosed "severe and permanent" psychological/psychiatric conditions, physical manifestations of those conditions, inability to perform daily activities, past and future "large sums of money" in the form of medical expenses, psychological treatment, therapy and counseling, past and future loss of income and past and future loss of earning capacity. (See Comp. ¶¶ 97 and 131.)

11.     Although Illinois requires that a plaintiff may only plead the jurisdictional minimum – damages in excess of $50,000 – it is clear from the Complaint, based on the gravity

of the fact allegations and categories of claimed damages, that the amount in controversy exceeds $75,000. See Shaw v. Dow Brands, Inc., 994 F.2d 364 (7th Cir. 1993).

12. Because there exists complete diversity of citizenship between Plaintiff and Defendants and because the jurisdictional amount in controversy exceeds $75,000, removal to this Court is proper.

WHEREFORE, the Archdiocese hereby requests that the state court action be removed to this Court pursuant to 28 U.S.C. § 1441.

Dated: August 6, 2008                **GREENSFELDER, HEMKER & GALE, P.C.**

By _____

Edward S. Bott, Jr., #3126866
Edward M. Goldenhersh *(pro hac)*
Robert L. Duckels, #6273846
Bernard C. Huger *(pro hac)*
10 S. Broadway, Suite 2000
St. Louis, MO 63102
Telephone:   (314) 241-9090
Facsimile:    (314) 345-5466

*Attorneys for Defendant The Catholic Archdiocese of St. Louis*

1069431                                  - 3 -

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served by enclosing the same in an envelope, postage fully prepaid, and by depositing said envelope in a U.S. Post Office Mail Box in St. Louis, Missouri on the 6th day of August, 2008 to:

**VIA U.S. MAIL**
Timothy J. Freiberg
Frederic W. Nessler
The Law Offices of Frederic W. Nessler &
Associates
536 N. Bruns Lane, Suite One
Springfield, IL 62702

*Attorneys for Plaintiff Shane Perry*

**VIA U.S. MAIL**
J. Christian Goeke
Law Offices of J. Christian Goeke
7711 Bonhomme Avenue, Suite 850
Clayton, MO 63105

*Attorney for Defendant Rev. Robert Johnston*

**VIA HAND-DELIVERY**

Clerk of the Court
Madison County Circuit Court
State of Illinois
155 North Main Street
Edwardsville, Illinois 62025

| | | |
|---|---|---|
| SHANE PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REV. ROBERT JOHNSTON, | ) | Case 08 L ___589___ |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE CATHOLIC ARCHDIOCESE OF | ) | |
| ST. LOUIS, a religious corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT AT LAW AND JURY DEMAND

NOW COMES the Plaintiff, SHANE PERRY, by and through his attorneys,

THE LAW OFFICES OF FREDERIC W. NESSLER & ASSOCIATES, LTD.,

complaining of the Defendants, REV, ROBERT JOHNSTON and THE CATHOLIC

ARCHDIOCESE OF ST. LOUIS, a religious corporation, and for his complaint, states as

follows:

## PREFATORY ALLEGATIONS

### PARTIES

1. Plaintiff, SHANE PERRY, is an adult male, age thirty-seven (37), and a

resident of the State of Illinois. Plaintiff was a minor at the time of all sexual abuse

alleged herein.

2. That Defendant, REV. ROBERT JOHNSTON, (hereinafter referred to as

REV. JOHNSTON), was, at all times relevant hereto, a resident of St. Louis County,

Missouri.

3.      Defendant, THE CATHOLIC ARCHDIOCESE OF ST. LOUIS, a
religious corporation (hereinafter referred to as ARCHDIOCESE) is a religious
organization consisting of several churches and parishes in and around the area of St.
Louis County, Missouri and the surrounding areas.

### DEFENDANTS' ROLES AND INTERRELATIONSHIP

4.      That Defendant, ARCHDIOCESE OF ST. LOUIS, is, and was at all times
relevant herein, a supervising entity of several parishes and churches in and around the
St. Louis metropolitan area, and had its offices in and did the majority of its religious and
spiritual work in St. Louis County, Missouri, and other vicinages within the St. Louis
metropolitan area.

5.      Ordination of a priest by the ARCHDIOCESE OF ST. LOUIS, or
incardination of a priest to the ARCHDIOCESE OF ST. LOUIS, represented to the
public and to those with whom the priest comes in contact that the priest was a person of
excellent moral character, worthy of trust, and, specifically, that its members could
reasonably rely upon the good moral character of the priest and trust that their children
would be safe alone in the company of its priests.

6.      That REV. JOHNSTON was hired/ordained as a Roman Catholic Priest,
and in such role, REV. JOHNSTON was expected to perform certain acts and duties,
including, but not limited to, supervising young people in the their activities at the
churches and schools associated with the ARCHDIOCESE OF ST. LOUIS, supervising
young people in the quest for religious and spiritual understanding, teaching young
people to act in a manner consistent with the ideals and teachings of the Roman Catholic

2

Church, and other acts and duties consistent with his role as a spiritual mentor and leader.

7.     At the time of his ordination as a priest, defendant, REV. JOHNSTON, took a vow of obedience to the defendant, ARCHDIOCESE OF ST. LOUIS. At all times pertinent herein defendant, REV. JOHNSTON, was employed by ARCHDIOCESE OF ST. LOUIS as a parish priest and was acting under the direct supervision, control and authority of its employees, agents and directors.

8.     THE ARCHDIOCESE OF ST. LOUIS appointed REV. JOHNSTON as associate pastor at various parishes during REV. JOHNSTON'S career.

9.     That between approximately 1979 and 1982, and all times relevant herein, REV. JOHNSTON was under the management and control of THE ARCHDIOCESE OF ST. LOUIS, their agents, personnel, and employees, and that these individuals monitored, supervised, hired, trained, counseled, employed, and otherwise exercised control over the activities of REV. JOHNSTON which involved the public and youth of said churches.

10.     That from 1979 to 1982, SHANE PERRY was sexually molested by REV. JOHNSTON. All of these actions taken by REV. JOHNSTON were within the scope of his relationship with THE ARCHDIOCESE OF ST. LOUIS, in that they occurred or were made possible by the relationship between the two. The above molestations constitute a breach of duty owed to SHANE PERRY by THE ARCHDIOCESE OF ST. LOUIS in hiring REV. JOHNSTON, thereby providing the opportunity for these sexual assaults to occur to SHANE PERRY.

11.     Further, that the ARCHDIOCESE OF ST. LOUIS, with all that this entity stands for, implied that REV. JOHNSTON was safe, morally and spiritually beneficial, and would not pose a risk to the children associated with the churches and groups

3

affiliated with the ARCHDIOCESE OF ST. LOUIS.

12. That each of the defendants were, at all times relevant herein, the agent, servant, employee, partner, associate, joint venturer, co-participant, and/or principal of or with each of the other remaining Defendants. Further, that at all times relevant to this cause of action, each Defendant was acting within the scope of such relationship with the full knowledge, authority, and permission of each of the remaining Defendants. and in addition, REV. JOHNSTON was the agent servant or employee of the other defendants who were in possession and control of the premises where some or all of the acts alleged herein, took place, which premises REV. JOHNSTON had permission to enter only on account of his status as a Catholic priest and which premises the remaining defendants as his employer or master, knew could be a place where harm could be inflicted on minors.

13. During his tenure with the ARCHDIOCESE OF ST. LOUIS, REV. JOHNSTON'S responsibilities included performing masses, solemnizing marriages, hearing confessions and granting absolution, the training, supervision and guidance of altar boys, and providing spiritual instruction and counseling to parishioners and students at the Parish School.

14. While employed at various parishes in the ARCHDIOCESE under the direct supervision and control of its agents and employees, REV. JOHNSTON systematically sexually molested children, including plaintiff, entrusted to his care and tutelage.

## HISTORICAL BACKGROUND

15. That in 1962, Defendants adopted, continued and/or adhered to a policy for the investigation and handling of crimes of a sexual nature, perpetrated by priests

4

against minors, and they were on notice that, absent suitable safeguards, minors were at grave risk of harm caused by priests who lacked adequate supervision.

16.    The defendant's policies of secrecy and self-dealing were known to REV. JOHNSTON and enabled and emboldened him, in that he knew any complaints about his conduct would be minimized and he would be protected from public disclosure.

17.    As detailed elsewhere in this complaint, the acts of Defendant, ARCHDIOCESE OF ST. LOUIS, allowed pedophile predators such as REV. JOHNSTON to perpetrate criminal acts of child sexual abuse upon children of its members. This is indicative of a pattern throughout many dioceses of the Roman Catholic Church that has gone on for decades throughout the United States. Persons controlling or directing the affairs of the Church, such as ARCHDIOCESE OF ST. LOUIS allowed this to occur by making fraudulent representations, concealing criminal activity, obstructing justice and criminal investigations, evading civil and/or criminal liability, and by inculcating parishioners to keep their scandals secret through the guise of religious teachings and spiritual instruction and counseling.

18.    The Church is a hierarchical organization having its principal place of business in Vatican City, Italy. The Vatican is considered a sovereign nation enjoying all the rights and privileges of a sovereign nation. The ultimate political and religious ruler of the Church and the Vatican is the Pope, currently Pope Benedict XVI.

19.    The Church, its dioceses, religious Orders, and educational institutions are supported primarily by assessments and/or contributions by its member parishioners.

20.    Leaders in the Church, including local leaders of ARCHDIOCESE OF ST. LOUIS, were aware since at least the 1950's that there existed a disturbing number of

incidents involving sexual molestation and abuse of minor children by Roman Catholic priests. (See, for example, the Holy See's 1962 INSTRUCTION entitled "On the Manner of Proceeding in Cases of Solicitation"). Plaintiff believed what he was taught by the Church. These teachings kept the wide spread problem of pedophile priests out of the public arena until recently.

21. Church leaders, including local leaders of ARCHDIOCESE OF ST. LOUIS, were aware that child molesters (also variously characterized as pedophiles, ephebophiles, and/or those with psychosexual disorders) are recidivistic, mobile predators that usually abuse multiple victims and gravitate to activities with young persons in order to continue to molest.

22. Leaders in the Church, including local leaders of Defendant, ARCHDIOCESE, were aware the effects of sexual molestation upon children could be devastating, and knew that parishioners and potential victims were largely naïve and ignorant of the reality and prevalence of pedophilia in the priesthood.

23. Leaders in the Church, including local leaders of Defendant, ARCHDIOCESE, were gravely concerned about the scandal that would result if parishioners and the public at large were aware of the prevalence of pedophilia in the priesthood. Further, these leaders were aware of, and gravely concerned about, the financial repercussions that such a scandal would bring to local parishes and the Roman Catholic Church as a whole.

24. Regrettably, Church leaders, including local leaders of Defendant, ARCHDIOCESE, placed concern for the Church's reputation and financial well being over the safety and well being of its parishioners and children everywhere. As a result,

6

since no later than the early 1960's, persons controlling or directing the affairs of the Church have engaged in a conspiracy to intentionally, recklessly and/or negligently conceal criminal conduct of their agents, aid and abet the concealment of that criminal conduct, aid and abet criminal sexual conduct, fail to report criminal conduct of their agents, obstruct justice, obstruct criminal investigations, obstruct state and/or local law enforcement, evade criminal and/or civil prosecution and liability, bribe and/or pay money to victims in order to keep their criminal conduct secret, violate the civil rights of children and families, commit fraud and/or fraudulent inducement of their parishioners in furtherance of their scheme to protect molesting priests and other clergy from criminal prosecution. This conspiracy was carried out in part to maintain or increase charitable contributions and tuition payments and/or to avoid public scandal involving the Church.

25.     This conspiracy was conducted by and through ARCHDIOCESE and others and directed by the Holy Roman Catholic Church (a/k/a, the Holy See).

26.     Evidence of this conspiracy by the Church, including ARCHDIOCESE and others, and of their knowledge that Roman Catholic clergy were abusing children can be seen in the Holy See's 1962 Instruction entitled "On the Manner of Proceeding Cases of Solicitation". (Hereinafter referred to as "INSTRUCTION"). This INSTRUCTION was intended to reach all patriarchs, Archbishops, Superiors and diocesan ordinaries (bishops). The very top of the INSTRUCTION states that it is, "to be diligently stored in the secret archives of the Curia as strictly confidential. Nor is it to be published nor added to with any commentaries."

27.     The INSTRUCTION contains explicit instructions as to how bishops and Church leaders are to proceed in cases where a priest engages in sexual conduct with

minor children or brute animals. The INSTRUCTION specifically mentions that these cases encompass situations where children are sexually abused. It provides that transferring offending (i.e., pedophile) priests to a different church is an appropriate way of dealing with the problem. The INSTRUCTION makes clear throughout that, in all circumstances, sex abuse cases dealing with minor children or brute animals are to be kept strictly secret. In particular, if Church leaders find that the allegations lack foundation, they are mandated to destroy all of the documents. If, however, the allegations are found to have foundation, the bishop and Church leaders must keep the pertinent documents in secret archives. The Vatican INSTRUCTION also encourages bishops and Church leaders to avoid "scandal". The INSTRUCTION identifies the worst crime as any obscene, external act, gravely sinful, perpetrated in any way by a priest with youths of either sex or sex with brute animals (bestiality). The INSTRUCTION by its terms applies to keep secret these crimes.

28.     As further evidence of this conspiracy to avoid "scandal" concerning the child sexual abuse by the Roman Catholic clergy, in 1985, the National Conference of Catholic Bishops received a report entitled "The Problem of Sexual Molestations by Roman Catholic Clergy" (Hereinafter referred to as "REPORT"). This REPORT described the continuing and growing problem of child sexual abuse by priests within the Church. According to the REPORT, if the Church failed to deal with the problem of its pedophile priests, the Church could face liability in excess of $1,000,000,000.00 over the next ten years.

29.     The REPORT outlined steps that the Church, through the National Conference of Catholic Bishops, must take to protect the Church and parishioners from

8

the devastating effects of priests who molest children. However, the Church and the National Conference of Bishops ignored the REPORT and, instead, continued to allow pedophile priests to molest children.

30. The REPORT further cautioned the National Conference of Catholic Bishops to resist the practice by some to sanitize or purge the secret files of potentially dangerous material. In addition, the REPORT warned the National Conference of Catholic Bishops that their practice of moving files containing potentially dangerous material to the Papal Apostolic Delegate, where the files would be immune from subpoena, could ultimately destroy the immunity enjoyed by the Holy See. Despite the seriousness of these warnings, they were not heeded.

31. Upon information and belief, ARCHDIOCESE and others engaged in the conspiracy and other wrongful activity described above in order to avoid scandal and protect its offending priests and others in the Church who knew of their conduct from criminal and civil prosecution, and protect the financial interests of the Church and ARCHDIOCESE.

32. In furtherance of its scheme and enterprise to protect predatory priests and other clergy from criminal prosecution, and to maintain or increase charitable contributions and tuition payments and/or avoid public scandal in the Church, persons controlling or directing the affairs of ARCHDIOCESE and others, intentionally and fraudulently engaged in the routine practice of maintaining secret "sub secreto" archival files of sexual misconduct by priests. These sub secreto files were and are accessible to the bishops only. Such secret files were not reported to or made available to law enforcement agencies which investigate the known crimes of the priests.

9

33.     In fact, on information and belief, the Church and its bishops encouraged the fraudulent purging of files and hiding of files from authorities and others seeking access to them. An example of such conduct is seen in a 1990 address to the National Conference of Catholic Bishops entitled "NCCB Guidelines, and other Considerations in Pedophilia Cases," by Bishop A. James Quinn, Auxiliary Bishop of Cleveland and a member of the Ad Hoc Committee to study how to handle wayward priests. In that address, Bishop Quinn stated:

> "Nevertheless, personnel files should be carefully examined to determine their content. Unsigned letters alleging misconduct should be expunged. Standard personnel files should contain no documentation relating to possible criminal behavior. Serious moral questions, signed allegations, those should be a part of the secret file anyhow. But they still subpoena them. But comb through your files. Now, when files have been subpoenaed, they cannot be tampered with, destroyed, removed; that constitutes obstruction of justice and contempt of court. Prior thought and study ought to be given if you think it's going to be necessary; if there's something there you really don't want people to see you might send it off to the Apostolic Delegate, because they have immunity to protect something that is potentially dangerous, or that you consider to be dangerous, you might send it there."

(The Apostolic Nuncio is the delegate from the Vatican and Holy See, which the Church contends enjoys sovereign immunity from lawsuits and subpoenas). In furtherance of this conspiracy, the Church, including Defendant Diocese, have misrepresented, concealed and suppressed the existence of the problem of pedophile priests from parishioners and the public at large by suggesting that priests that were transferred because of credible allegations of sexual molestation or were in treatment due to sexual misconduct, were "on leave," on "retreat," on "sabbatical" and/or participating in "advanced studies".

34.     Leaders of the Church, including local leaders of ARCHDIOCESE OF ST. LOUIS, were aware that the problem of pedophile priests within the Church was a

widespread problem since at least the 1950's and that as a result of their conspiracy to keep this problem secret, millions of innocent children were put at risk. Thousands of those innocent children, including Plaintiff, fell prey to these pedophile priests and were gravely harmed and injured.

35.     When credible evidence of sexual molestation by a priest was brought to the attention of the Church, including ARCHDIOCESE, the Church represented to victims and their families that such molestation was an isolated incident and that the problem would be "taken care of" by the Church. Church leaders, including local leaders of ARCHDIOCESE, secretly colluded and conspired to conceal all such offenses using whatever means necessary including, but not limited to, transferring the offending priests to other assignments without informing the victims or their families that the priests would continue in ministry, parishioners or subsequent supervisors of the molestation or the reason for the transfer, and law enforcement or the general public about the offending priests' pedophile activities. Further, those offending priests which were removed from their assignments or suspended for misconduct were continuously listed in official Catholic Directories by euphemism, such as "absent on leave", "advanced studies", "on special assignment" or "retired".

36.     Maintaining that they viewed sexual assaults of children by priests as moral failings, the Church, including ARCHDIOCESE, professed to be saddened by such activity and claimed that at all times they took appropriate steps to detect and prevent such activities. In fact, to protect their reputations and income, the Church and Defendant Diocese treated the sexual molestation of children by priests as scandal that

was to be suppressed at any cost, despite knowing that suppression put the minor children under the care of the Church and Defendant Diocese at grave risk.

37. The Church, including local leaders of ARCHDIOCESE, deliberately adopted a policy of public deception.

38. It was and is the policy and practice of the Church and ARCHDIOCESE to secrete the identities, retain the services of, and protect sexual offenders who are or had been Roman Catholic priests incardinated to and functioning within the ARCHDIOCESE over whose conduct the ARCHDIOCESE had control, and for whom ARCHDIOCESE was responsible in a master-servant relationship.

39. The Church and ARCHDIOCESE purposely suppressed the identity of sexual offenders to prevent the filing of both criminal and civil complaints in courts of competent jurisdiction, thus enabling further criminal conduct by those sexual offenders, while preventing the diminution of the flow of donated funds to the Church and ARCHDIOCESE.

40. In instances where the Church, including local leaders of ARCHDIOCESE, had actual knowledge about offending clerics, including REV. JOHNSTON, they failed to warn children and their parents and denied knowledge thereof.

41. Despite having actual knowledge of REV. JOHNSTON'S pedophile propensities and previous instances of molestation of other children, ARCHDIOCESE, and others concealed the danger which he and other offending clerics presented by misrepresenting them as priests in good standing, thus enabling those offending clerics to retain their continued, unrestricted access to minor children.

42. Further, despite having actual knowledge of REV. JOHNSTON'S recidivistic pedophile history, ARCHDIOCESE OF ST. LOUIS did not provide REV. JOHNSTON with ongoing sex abuse therapy or monitor him under close supervision.

## INDOCTRINATION AND CHARACTERIZATION OF PRIESTS, INCLUDING REV. ROBERT JOHNSTON, AS AN ALTER CHRISTI

43. By tradition, Roman Catholics, including Plaintiff, are taught to view priests as Alter Christus or another Christ (see The Catechism of the Catholic Church, #1542-48,) and to hold priests in the highest esteem as earthly representatives of God. They are taught that priests, unlike lay people, belong to a separate and higher state in life, the so-called ontological change occurring at priestly ordination (see The Catechism of the Catholic Church #1548) determining a separate, higher "clerical state", which they represent to be of divine origin and in which they participate as Alter Christi (other Christs) which entitles them to special privileges. For these and other reasons relating to the practices of the Church, priests and other persons in leadership positions in the Church have traditionally occupied a position of great trust and allegiance among the Catholic parents and youth, including Plaintiff.

44. As part of this traditional reverence of Catholic Church clergy, Plaintiff was instructed and indoctrinated as a child to show obedience to priests and was taught to believe and did believe that it would be "sinful" or wrong to make any kind of an accusation against a priest or bishop. Additionally, Plaintiff was instructed and believed that priests and bishops followed their promise of celibacy and virtue of chastity and could not and would not engage in conduct considered sexual, evil or wrong. Plaintiff relied upon these teachings and incorporated them into his religious beliefs and practices.

13

Accordingly, he believed that it would be sinful or wrong for anyone to make any kind of an accusation against a priest or bishop.

45. In addition, Plaintiff and others were taught and instructed that Church issues and scandals were not to be disclosed to the public at large or to law enforcement agencies and that any such scandals were to remain strictly secret. "Good" Catholics, such as Plaintiff and his family, were taught and believed that such issues would be handled internally by the Church, including Defendant Diocese, and that it was un-Christian and counter to the tenets of the faith to make any public allegations against the Church or any priest. In fact, to disclose any such issues or scandals could result in excommunication. (See, the Holy See's 1962 INSTRUCTION entitled "On the Manner of Proceeding in Cases of Solicitation". Plaintiff believed what he was taught by the Church. These teachings kept the wide spread problem of pedophile priests out of the public arena until recently.

46. As a result of his early instruction and indoctrination, it would never have occurred to Plaintiff that the Church, including ARCHDIOCESE OF ST. LOUIS, or any priest would engage in criminal behavior, or knowingly or actively be involved in a conspiracy to conceal criminal behavior. Accordingly, even after REV. JOHNSTON had sexually molested him, while still a minor, Plaintiff assumed that he was somehow the guilty party, rather than REV. JOHNSTON and Defendant Diocese.

47. THE ARCHDIOCESE OF ST. LOUIS deliberately exploited the respect and reverence for the Catholic Church and its clergy which had been inculcated into Plaintiff and other victims of sexual abuse and their families.

14

48. Further, as a result of that early instruction and indoctrination, Plaintiff assumed that REV. JOHNSTON'S sexual molestation of him was an isolated occurrence happening only to him and that ARCHDIOCESE was unaware and uninvolved, regarding both the criminal sexual behavior and the wide-range efforts to conceal that criminal conduct from him and others.

49. REV. JOHNSTON encouraged and strengthened plaintiff's faith, trust and reliance upon REV. JOHNSTON by repeatedly assuring plaintiff that REV. JOHNSTON'S directions, instructions and conduct were morally, socially and religiously beneficial and would cause and enable plaintiff to experience optimal mental, moral, emotional and psychological growth and development. REV. JOHNSTON further exploited plaintiff's suggestibility be assuring plaintiff that adherence to REV. JOHNSTON'S instructions and directions was necessary to plaintiff's proper growth and development, even though doing so might at times seem to conflict with plaintiff's innate but inferior and inadequately informed sense of propriety or rectitude. REV. JOHNSTON repeatedly assured and instructed plaintiff that the teachings and instructions of the Church, as given through REV. JOHNSTON, were perfect and infallible and superior to imperfect human laws; that adherence to REV. JOHNSTON'S teachings and compliance with REV. JOHNSTON'S directions and conduct were in all respects good and beneficial and could cause no harm.

50. REV. JOHNSTON knowingly used and subverted Catholic doctrines of infallibility and deference to priests and the priesthood to overcome and suppress plaintiff's independent judgment of right and wrong and render plaintiff amenable to pedophilic sexual predation by REV. JOHNSTON. REV. JOHNSTON knew and

15

intended that his indoctrination of plaintiff would shape and control plaintiff's perceptions and conduct throughout plaintiff's life and impair or destroy plaintiff's ability to independently judge or perceive the injuriousness of REV. JOHNSTON'S conduct. REV. JOHNSTON'S indoctrination of plaintiff did in fact so shape and control plaintiff's perceptions, reasoning and conduct, that plaintiff became and remained unable to independently judge or perceive the injuriousness of REV. JOHNSTON'S conduct.

51.    Plaintiff perceived his faith, trust and reliance on REV. JOHNSTON and the priest's teachings, directions and conduct to be necessary, mandatory and reasonable because of the institutional reverence and deference accorded priests and the priesthood within the Church and because REV. JOHNSTON'S teachings and directions on matters of doctrine were consistent with the teachings and directions of other priests and religious; plaintiff's only experience with close personal interaction with a priest was with REV. JOHNSTON who continually assured plaintiff that REV. JOHNSTON'S conduct with plaintiff was innocent and beneficial. Plaintiff's faith, trust and reliance on REV. JOHNSTON and the priest's teachings, directions and instructions became a component of plaintiff's perception of the world and controlled and dominated plaintiff's perceptions and conduct long after plaintiff ceased to have contact with REV. JOHNSTON.

## PLAINTIFF'S BACKGROUND

52.    Plaintiff was born into and raised within a staunchly Roman Catholic family. By virtue of the ubiquitous presence of Roman Catholic teaching, and the reinforcement of the same, Plaintiff came to believe that unquestioning acceptance of and adherence to the teachings, precepts and directions of the Church, as promulgated

16

through the Catholic religious hierarchy, including local Bishops and parish priests, was a central tenet of plaintiff's home, school and religious life. These beliefs were facts in plaintiff's perceptions of life.

53. Plaintiff was consistently and unremittingly indoctrinated, and thereby caused to believe, from infancy forward, within his Catholic family, Catholic schools, and the institutional Church, that in matters of faith and morality, the pronouncements, instructions and directions of the Church via its hierarchy from the Pope, at the apex, down through local Bishops and Priests, were doctrinally infallible and, in daily life and experience, pervasive and mandatory. Deviation from strict adherence to Catholic teaching, practices, policies or directives, as locally enunciated and enforced by Bishops and Priests, invited the coercive effect of social exclusion and isolation from the Church community, and the doctrinal threat of eternal damnation. These believed matters became facts in plaintiff's perception of life.

## FACTS GIVING RISE TO THE CAUSES OF ACTION PLEADED HEREIN

54. That between 1979 and 1982, and at all other relevant times, Defendant, REV. JOHNSTON, former priest for THE ARCHDIOCESE OF ST. LOUIS, was employed and under the management and control of THE ARCHDIOCESE OF ST. LOUIS.

55. That, SHANE PERRY, born September 13, 1970, was, at all times relevant hereto, a minor and a resident of Christian County, Illinois.

56. That between 1979 and 1982, SHANE PERRY, then 9 to 12 years of age, was a parish member at St. Maurice's Parish, Christian County, Illinois.

57. Nine year old SHANE PERRY was introduced to REV. JOHNSTON by

17

Rev. Norman Goodman, who was the parish priest at St. Maurice's Parish. During that time period, SHANE PERRY came to know, admire, trust, revere and respect REV. JOHNSTON as a priest, teacher, counselor, spiritual advisor, scholastic advisor and religious instructor.

58.     That from 1979 to 1982, SHANE PERRY, while a minor, was sexually assaulted by REV. JOHNSTON, including inappropriate touching, fondling, masturbation, oral sex, attempted anal penetration, depictions in pictures and videotapes of sexual acts, kissing, pornography, nudity, and other sexual acts. Further, that REV. JOHNSTON perpetrated these unwanted sexual advances upon Plaintiff in his role as a Roman Catholic priest for THE ARCHDIOCESE OF ST. LOUIS.

59.     That the aforementioned acts of sexual abuse took place in hotel rooms in Collinsville, Illinois and Edwardsville, Illinois, at a lake house in St. Louis County, at St. Louis Cardinals baseball games, and at other locations owned and operated by ARCHDIOCESE.

60.     That the aforementioned events were unwanted sexual advances made upon the Plaintiff, SHANE PERRY, perpetrated by the Defendant, REV. JOHNSTON.

61.     That during the aforementioned period, REV. JOHNSTON was an agent for THE ARCHDIOCESE OF ST. LOUIS, which assumed responsibility for the training and spiritual well-being of minors.

62.     That while acting as an agent for THE ARCHDIOCESE OF ST. LOUIS, REV. JOHNSTON was viewed as a mentor, spiritual and moral leader, teacher, priest, and counselor, routinely working with and among young people. In such position, REV. JOHNSTON used these roles to gain a trust and confidence among his followers,

18

including SHANE PERRY, in order to more easily sexually exploit these young

individuals. REV. JOHNSTON was considered by the Plaintiff as an honored friend and

mentor in Plaintiff's involvement with the church and as such, was bound by a duty to act

in a manner consistent with these roles

63.     That during the aforementioned period, REV. JOHNSTON negligently

and carelessly failed to exercise reasonable care in the training, supervision, mentoring,

and guidance of minor children by the following acts of negligence:

> a.      REV. JOHNSTON manipulated the emotions of the minor Plaintiff
>         by way of pre-sexual grooming and played upon the minor
>         Plaintiff here in order to gain control and obedience over him, thus
>         ensuring silence by the victim of the sexual assault and creating an
>         environment of confusion, guilt, shame, and other emotional
>         disorders so that REV. JOHNSTON could exploit the power
>         imbalance created by the roles he assumed with his position;
>
> b.      REV. JOHNSTON negligently, carelessly, and improperly failed
>         to recognize that his sexualization of the relationship between a
>         moral leader and a minor child was a mishandling of the
>         phenomena of counter-transference, and thus exploited the
>         relationship with Plaintiff for his own personal gain.
>
> c.      REV. JOHNSTON negligently counseled plaintiff in his moral,
>         spiritual and psychological development.

64.     That at no time did THE ARCHDIOCESE OF ST. LOUIS adopt a policy

or rules or regulations establishing guidelines for visitors in rectories, meetings with

children without the presence of other adults, that would serve to protect minors.

65.     That at no time during the period of time mentioned herein, did THE

ARCHDIOCESE OF ST. LOUIS have in place a system or procedure to supervise and/or

monitor priests and their pre-sexual grooming of children in order to prevent or lessen the

risk of sexual assaults occurring to minors, and did not employ reasonably sufficient

procedures for testing and screening potential leaders/priests for dangerous sexual

19

tendencies, such as those shown by REV. JOHNSTON. Not withstanding the fact that for at least since 1962 Defendants were aware that children were victims of sexual abuse by clergy and that children were deserving of special protection.

66.    That indeed, on the contrary, THE ARCHDIOCESE OF ST. LOUIS, along with other dioceses and seminaries, trained priests such as REV. JOHNSTON to ingratiate themselves with youth as a specific method of interesting young Catholics in religious vocations. Despite knowledge that, historically, priests have engaged in sexual abuse of minors while in the guise of exercising their religious authority, Defendants facilitated and enabled REV. JOHNSTON'S actions which are the subject of this complaint. As a direct result of this, the Defendants made the youth members involved with THE ARCHDIOCESE OF ST. LOUIS, accessible and vulnerable to acts of pre-sexual grooming, all of which were accomplished in the scope of employment or agency of the Defendants.

67.    That at all times relevant herein, all individuals associated with and employed by THE ARCHDIOCESE OF ST. LOUIS, understood the dangers posed by priests with pederastic tendencies and that children would be vulnerable to these tendencies.

68.    That if THE ARCHDIOCESE OF ST. LOUIS had in place a system or procedure to test and/or screen potential leaders/priests for dangerous sexual tendencies, THE ARCHDIOCESE OF ST. LOUIS would have discovered, prior to 1979, and the years that followed while he was acting as set forth herein, that REV. JOHNSTON posed a significant risk to the youth involved, and should not have been entrusted with the safety of minor children. Further, that it would have been foreseeable, or should have

been reasonably foreseeable, that REV. JOHNSTON would engage in pederastic activities with SHANE PERRY and/or other minor children involved with ARCHDIOCESE.

69.    That the Defendants knew or should have known of the dangers presented by REV. JOHNSTON, and in failing to adopt precautionary procedures and policies, and seeing to the enforcement of such, they therefore concealed the dangerous sexual propensities of REV. JOHNSTON and they acted in the interest of REV. JOHNSTON.

70.    That prior to 1979, and continuing up to and including the sexual assaults, Defendant, ARCHDIOCESE OF ST. LOUIS, entered into an agreement to defraud, conceal, and suppress facts known to them and their notice of REV. JOHNSTON'S reported deviant sexual conduct and other inappropriate conduct with minors.

71.    That in furtherance of this agreement, THE ARCHDIOCESE OF ST. LOUIS failed to exercise their authority to confront, discipline, remove, or investigate allegations of the sexual conduct perpetrated by REV. JOHNSTON. Further, that they denied having any prior notice or that any individual had ever been aware of these allegations prior to this cause of action.

72.    That between 1979 and 1982, and all times relevant herein, REV. JOHNSTON was under the management and control of THE ARCHDIOCESE OF ST. LOUIS, their agents, personnel, and employees, and that these individuals monitored, supervised, trained, counseled, employed, and otherwise exercised control over the activities of REV. JOHNSTON which involved the public and youth.

73.    That as a result of Defendant's supervision and retention of REV. JOHNSTON, the Defendants herein were aware of REV. JOHNSTON'S pederastic

tendencies and the risks he posed to the youth involved with THE ARCHDIOCESE OF ST. LOUIS. Further, that the Defendant was aware, or should have been aware, at the time, that REV. JOHNSTON was unfit for the position of which he held, and that he was unfit to perform the duties consistent with that role.

74.     Upon information and belief, it is alleged that through various acts and notices, the Defendant was aware, and had actual notice, that REV. JOHNSTON posed a serious threat to the physical and mental wellbeing of the youth he came in contact with.

75.     That in 1979 and thereafter, after receiving notice of REV. JOHNSTON'S deviant sexual conduct and predisposition, agents of HOLY FAMILY, and ARCHDIOCESE OF ST. LOUIS and the defendant BISHOP, represented that REV. JOHNSTON was a safe and beneficial leader for children. Further, that such representations were known to be false and made with the intent to deceive, defraud, and conceal these deviant acts so that no scandal would be brought against themselves and their affiliates.

76.     That Defendants, REV. JOHNSTON and THE ARCHDIOCESE OF ST. LOUIS further breached the duty owed to Plaintiff, in that they failed to provide a safe haven and failed to take any action upon notice of the dangers posed by REV. JOHNSTON, and, but for this breach, the Plaintiff, SHANE PERRY, would never have been subjected to the sexual abuse suffered.

77.     That the Defendants concealed the dangerous sexual propensities of REV. JOHNSTON and thereby acted in the interest of REV. JOHNSTON and themselves and their public image.

78.     At all times material to Plaintiff's Complaint, REV. JOHNSTON occupied

a special and fiduciary relationship between himself as a representative of the Co-Defendant, THE ARCHDIOCESE OF ST. LOUIS.

79.     Defendant, REV. JOHNSTON, engaged in the negligent acts of sexual deviancy more fully set forth above. The original contact of REV. JOHNSTON with Plaintiff came as a result of Plaintiff being involved in activities and functions provided the ARCHDIOCESE. These acts by the Defendant were perpetrated upon the Plaintiff by REV. JOHNSTON, while in the performance of his duties and in the course of his employment as an ordained Roman Catholic Priest, and it was the accessibility of the Plaintiff as a member of the Catholic Church where Plaintiff spent extraordinary time as a guest of REV. JOHNSTON, that led to the sexual assault committed by REV. JOHNSTON.

80.     Defendant, REV. JOHNSTON, at all times alleged in this Complaint, was under the dominion and control of ARCHDIOCESE and acting within the scope of his employment and responsibilities as an ordained Roman Catholic Priest when he perpetrated his sexual advances on the then minor Plaintiff, SHANE PERRY.

81.     The ARCHDIOCESE OF ST. LOUIS created the misperception in the mind of Plaintiff and others that he and other children were safe with priests in general and with REV. JOHNSTON in particular, and that, if there was conduct about which Plaintiff or his family might be concerned, it was an isolated instance of spurious misconduct which would be taken care of. In fact, Plaintiff was a victim of a known and preventable hazard that the Defendant, ARCHDIOCESE OF ST. LOUIS, created and allowed to continue.

82.     Plaintiff had the right to rely, and did rely, on the representations and

23

teachings of the Church and ARCHDIOCESE OF ST. LOUIS, including, but not limited to, representations regarding priests in general, and regarding REV. JOHNSTON in particular, including the representation that he was a priest in good standing. Plaintiff also expected and believed that the Church and ARCHDIOCESE OF ST. LOUIS would not tolerate criminal misconduct that represented a known threat to children by any priest.

83. That each of the Defendants were, at all times relevant herein, the agent, servant, employee, partner, associate, joint venturer, co-participant, and/or principal of or with each of the other remaining Defendants. Further, that at all times relevant to this cause of action, that each Defendant was acting within the scope of such relationship with the full knowledge, authority, and permission of each of the remaining Defendants.

84. Defendants' policies were designed to discourage victims' complaints and, as such, were a breach of their fiduciary and special relationship with Plaintiff, SHANE PERRY.

85. The conduct of the Defendants was, and is, willful and wanton and in gross disregard of Plaintiff's rights to be free from injury to his person.

86. Further, that ARCHDIOCESE OF ST. LOUIS, with all that this entity stands for, implied that REV. JOHNSTON was safe, morally and spiritually beneficial, and would not pose a risk to the children associated with these groups.

87. That if the Defendant had in place a system or procedure to test and screen potential leaders/priests for dangerous sexual tendencies, ARCHDIOCESE OF ST. LOUIS would have discovered, prior to 1979, that REV. JOHNSTON posed a significant risk to the youth involved, and should not have been entrusted with the safety of minor children. Further, that it would have been foreseeable, or should have been foreseeable,

that REV. JOHNSTON would engage in pederastic activities with SHANE PERRY

and/or other minor children involved with ARCHDIOCESE OF ST. LOUIS

88.     Defendant, THE ARCHDIOCESE OF ST. LOUIS, was under a duty to

exercise reasonable care for the safety of children under the tutelage and guidance of

Defendant;'s employees, including Co-Defendant, REV. JOHNSTON. Notwithstanding,

THE ARCHDIOCESE OF ST. LOUIS was negligent in one or more of the following

ways:

> a.      Defendant negligently failed to perform suitable or adequate
>         psychological screening or evaluation of Co-Defendant, REV.
>         JOHNSTON, prior to ordination to determine his fitness for the
>         ministry generally and, particularly, his fitness to act as an advisor,
>         mentor and confidant of adolescents;
>
> b.      Prior to placing him in active ministry, Defendant negligently
>         failed to adequately educate and train REV. JOHNSTON in
>         appropriate techniques of establishing boundaries and limits to
>         relationships to enable him to properly conduct counseling and
>         confidential relationships with adolescents;
>
> c.      Defendant failed to conduct periodic screening and assessment of
>         REV. JOHNSTON'S conduct and interaction with adolescents,
>         including Plaintiff, to ensure that REV. JOHNSTON'S conduct did
>         not exceed lawful bounds;
>
> d.      Defendant negligently permitted REV. JOHNSTON to take
>         adolescents, including Plaintiff, on unsupervised and unchaperoned
>         overnight or extended trips;
>
> e.      Defendant negligently failed to require that all interactions
>         between priests, including REV. JOHNSTON, and adolescents be
>         undertaken in locations and under circumstances that minimized
>         the opportunity for inappropriate sexual conduct;
>
> f.      Defendant negligently failed to educate, inform and warn children
>         and adolescents of ARCHDIOCESE OF ST. LOUIS, including
>         Plaintiff herein, that sexual conduct between children/adolescents
>         and adults, including priests, was always inappropriate, wrongful
>         and harmful; and,

g.      Defendant placed or permitted REV. JOHNSTON to remain in a situation where he had access to adolescents when Defendant knew, or should have known, of prior episodes of sexually abusive or questionable conduct on the part of REV. JOHNSTON.

89.     Upon information and belief, after learning of REV. JOHNSTON'S criminal conduct, Defendant, ARCHDIOCESE OF ST. LOUIS, ratified his conduct by failing to report him to law enforcement authorities, failing to notify police, parishioners, or Plaintiff's parents or the laity. Instead of disciplining REV. JOHNSTON, ARCHDIOCESE OF ST. LOUIS assigned REV. JOHNSTON to another parish. ARCHDIOCESE OF ST. LOUIS'S conduct explicitly communicated to Plaintiff, SHANE PERRY, that REV. JOHNSTON'S conduct was proper, thereby reinforcing by Diocesan silence prior representations that REV. JOHNSTON'S conduct was innocent and beneficial and, accordingly, non-actionable. Defendants knew and intended that their actions would mislead Plaintiff, SHANE PERRY, and prevent him from discovering his injuries, his complaints, and all other possible trauma and ultimately exacerbate his emotional distress.

## PLAINTIFF'S DAMAGES

90.     The sexual abuse of Plaintiff and the circumstances under which it occurred caused Plaintiff to develop confusion, various coping mechanisms and symptoms of psychological disorders, including great shame, guilt, self-blame, depression, repressed memory, suppressed memory and disassociation.

91.     That the Plaintiff has been diagnosed by a licensed psychologist as suffering from psychological disorders which were the cause of him not recognizing or recalling the relationship between his psychological dysfunction and the abuse suffered at the hands of REV. ROBERT JOHNSTON. Further, that said psychological disorders

26

began prior to the Plaintiff reaching the age of eighteen (18) and have continued until the date referenced above. Said psychological disorders include all psychological disorders referenced elsewhere in this complaint and are collectively incorporated into this paragraph.

92. The conditions that the Plaintiff suffers from occurred prior to him reaching the age of eighteen (18) and were the cause of him not recognizing or recalling the relationship between his psychological dysfunction and the abuse suffered at the hands of REV. JOHNSTON.

93. That the sexual abuse suffered by the Plaintiff and the circumstances under which it occurred caused SHANE PERRY to develop various psychological coping mechanisms which reasonably made him incapable of ascertaining the resulting damages from the conduct.

94. SHANE PERRY was diagnosed by a licensed professional in the area of forensic psychology as suffering from attention deficit/hyperactivity disorder, posttraumatic stress disorder with symptoms of depression, anxiety, anger, interpersonal alienation, distrust, and guilt as a result of the sexual abuse suffered at the hands of REV. JOHNSTON.

95. SHANE PERRY specifically avers that he suffers from other various forms of recognized and accepted psychological/psychiatric conditions, including, but not limited to, depression, suicidal ideation, childhood amnesia induced by sexual abuse, delayed recall syndrome, dissociation, post traumatic stress disorder, immobility, emotional duress, and other various conditions.

96. The DSM-IV (diagnostic manual) by the American Psychiatric

Association recognizes dissociative childhood amnesia, posttraumatic stress disorder and dissociative identity disorder, which all mention repressed memory as a symptom of the psychological sequelae associated with these problems brought about by sexual abuse.

97.     As a direct result of the sexual abuse and sexual exploitation, Plaintiff has suffered and continues to suffer severe and permanent emotional distress, resulting in physical manifestations, embarrassment, loss of self-esteem, humiliation and psychological injuries, was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling, and has incurred and will continue to incur loss of income and/or loss of earning capacity.

98.     Progressively through adolescence and into adulthood, Plaintiff experienced perceptions of lack of self-worth, distrust of and alienation from others, inability to form or maintain close emotional or intimate relationships, fearfulness and anxiety. These feelings impaired Plaintiff in his educational, social, emotional and employment associations, and were ongoing sources of mental and psychological distress. SHANE PERRY was unable (for reasons more fully set forth hereinafter) to identify any specific person, event or occurrence as a primary or contributory cause for his psychological and emotional difficulties.

## REPRESSED AND SUPPRESSED MEMORY OF THE ABUSE

99.     Plaintiff states that prior to attaining the age of eighteen, the memories of the childhood sexual abuse were psychologically subliminated, repressed and suppressed by reason of the great pain and anguish created by the abuse.

28

100.    SHANE PERRY suppressed and repressed the memories of the abuse until a short time ago. More specifically, SHANE PERRY suppressed and repressed the memories of the abuse until approximately early 2004.

101.    That is was not until approximately early 2004 that the Plaintiff began having recurring visions of the abuse suffered at the hands of REV. JOHNSTON, with said visions being brought on through several different factors.

102.    At this time, SHANE PERRY began to remember and recollect the events that occurred between himself and between REV. JOHNSTON.

103.    These memories of the sexual abuse were brought on by several factors, including, but not specifically limited to:

a.    Reading news stories, reports, and other media relating to the scandal in the Catholic Church and other facts relating to their desire to cover up any events that had happened in the past;

b.    SHANE PERRY learning that REV. JOHNSTON had abused several of his classmates and friends.

104.    At the time of these events, SHANE PERRY began to experience negative psychological, physiological, mental and emotional changes that were unexplained to him and that he had no understanding of. Such changes included paranoia, anxiety attacks, anti-social tendencies, depression, anger and rage, nervous twitches, and other problems that were unexplained to him.

105.    Acting in concert, the aforementioned factors, along with other acts, acted as triggers that brought to light memories of the abuse and an understanding of the resulting damages suffered by SHANE PERRY as a result of the sexual abuse perpetrated upon him by REV. JOHNSTON.

106.    That it was not until approximately early 2004 that SHANE PERRY

29

began to remember the abuse perpetrated upon him by REV. JOHNSTON and understood or appreciated that the problems he was experiencing sexually, mentally, physically, and psychologically, were the direct result of the sexual abuse.

## THE STATUTE OF LIMITATIONS
## COMMON LAW DISCOVERY AND DISABILITY

107. That the Plaintiff was subject to intimidation, manipulation, and fraud on the part of the Defendants, REV. JOHNSTON and ARCHDIOCESE OF ST. LOUIS, by its priests, administration, personnel, and other agents, so as to prevent the exposure of REV. JOHNSTON'S acts of abuse and/or the actions and history of ARCHDIOCESE OF ST. LOUIS.

108. As a result of the disorders described more fully above, SHANE PERRY and his family's religious beliefs, and the Defendants' conspiracy and fraudulent conduct, SHANE PERRY was unable to perceive or know the existence or nature of his psychological and emotional injuries and their connection to the sexual abuse perpetrated upon him by REV. JOHNSTON.

109. Until approximately early 2004, SHANE PERRY had not discovered, understood, or appreciated that the problems he was experiencing, sexually, mentally, physically, and psychologically, were the direct result of the sexual abuse. Plaintiff pleads delayed discovery of the harm and thus delay in the accrual of claims against all the parties.

110. The Roman Catholic teaching to which SHANE PERRY was exposed to during childhood and early adolescence presented an overarching, monolithic, immutable and assertively divinely-ordained edifice which was calculated and intended to and did in fact cause Plaintiff, and numerous others like him, to be rendered intellectually and

emotionally incapable of questioning, doubting or objectively analyzing Catholic Church
related events with anything approaching that normal rational rigor applied to secular
actions or events. As a result of Defendants' teachings and indoctrination, Plaintiff
sought understanding by looking at life through the "polarizing filter" of religious
indoctrination and was effectively incapable of looking at events associated with his
religious experiences through the eyes of a reasonable prudent person. The altered
reasoning experienced by Plaintiff was a mental state calculated and intended by
Defendants to be a lifelong result of their indoctrination.

111.    It was not until approximately early 2004, that SHANE PERRY
discovered, and linked together, both the occurrences of the childhood sexual abuse and
the fact that his physical, mental, psychological, and psychiatric injuries directly resulted
from this same childhood sexual abuse, and finally, that Plaintiff had the emotional
ability to bring this action. Further, that the delayed discovery of the causal connection
between the childhood sexual abuse and the injuries he has suffered was brought about
through no fault of his own, but was a direct, psychological result of the abuse suffered
by SHANE PERRY.

112.    SHANE PERRY specifically avers that he suffers and has been diagnosed
with various forms of recognized and accepted psychological/psychiatric conditions,
including, but not limited to depression, repressed and suppressed memory, post
traumatic stress disorder, suicidal ideation, childhood amnesia induced by sexual abuse,
delayed recall syndrome, dissociation, immobility, emotional duress, and other various
conditions. Further, that these conditions, which were caused by the aforementioned
childhood abuse, prevented SHANE PERRY from recognizing the fact that any cause of

action was available to him against the various Defendants.

113.    That further, the conduct of the Defendants caused a legal disability, as defined by 735 ILCS 13-211, and until he was able to meet with his attorney, and file this action, his ability to meet his individual needs was substantially impaired, and this fact was known to ARCHDIOCESE OF ST. LOUIS.

## FRAUDULENT CONCEALMENT AND EQUITABLE ESTOPPEL

114.    As a result of the Defendants' conduct as described herein, including, but not limited to, their fraudulent concealment, as defined in 735 ILCS 5/13-215, and conspiracy, all Defendants are equitably estopped from asserting any statute of limitation and/or statute of repose defenses which Defendants may claim are applicable to this complaint.

115.    The applicable statute of limitations are tolled because all of the Defendants fraudulently concealed REV. JOHNSTON's exploitation and misconduct from law enforcement, Plaintiff's family, members of the church and community and any other individuals who had the authority to stop the abuse from happening. As a result of the Defendants' conduct, along with the psychological dysfunctions referenced above, Plaintiff was unable to discover the wrongfulness of REV. JOHNSTON's conduct. Further, all the Defendants concealed the nature of REV. JOHNSTON's sexual abuse by further allowing REV. JOHNSTON to continue to serve as a priest and spiritual adviser despite his criminal conduct.

116.    That by virtue of their continuing victimization of Plaintiff and breach of their fiduciary relationship to him, all Defendants are estopped from raising the defenses of statute of limitations and/or statute of repose.

32

117.     The applicable statute of limitations are further tolled because the

Defendant, ARCHDIOCESE, fraudulently concealed that they had prior notice that REV.

JOHNSTON had sexually abused other children predating his sexual abuse of the

Plaintiff herein, and thereby participated in an active and ongoing conspiracy to conceal

their wrongful conduct from the Plaintiff, parishioners, the public, law enforcement and

other authorities.

118.     That by adopting the " Essential Norms for Diocesan/Eparchial Policies

Dealing With Sexual Abuse of Minors by Priests or Deacons", the Defendants have

admitted that the limitations on the time to bring a complaint of childhood sexual abuse

can not be artificially limited to a time certain, and that the risk a predator poses to

members of the Catholic Church and others with whom he may come into contact

justifies the option of removal from the priesthood, and therefore the Defendants are

estopped from claiming that the passage of time can be the basis for precluding redress

for the Plaintiff.

119.     In eradicating the time limits within which they can act to remove a priest

from the priesthood, ARCHDIOCESE OF ST. LOUIS is estopped from raising the civil

statute of limitations as a defense to liability in that they have admitted and accepted as

true, the premise that credible complaints of abuse are not properly the subject of time

bars, in that the risk presented by offenders is so grave.

### CHILDHOOD SEXUAL ABUSE STATUTE, 735 ILCS 5/13-202.2

120.     At the time of filing of the Complaint herein, there was in full force and

effect in the State of Illinois a certain limitations statute cited as 735 ILCS 5/13-202.2

(Childhood Sexual Abuse) which provided *in pari materia* that:

(b) *Notwithstanding any other provision of law,* an action for damages for personal injury based on childhood sexual abuse must be commenced *within 10 years of the date the limitation period begins to run under subsection (d) or within* 5 2 years of the date the person abused discovers or through the use of reasonable diligence should discover *both (i)* that the act of childhood sexual abuse occurred and *(ii)* that the injury was caused by the childhood sexual abuse. *The fact that the person abused discovers or through the use of reasonable diligence should discover that the act of childhood sexual abuse occurred is not, by itself, sufficient to start the discovery period under this subsection (b). Knowledge of the abuse does not constitute discovery of the injury or the causal relationship between any later-discovered injury and the abuse*

(c) If the injury is caused by 2 or more acts of childhood sexual abuse that are part of a continuing series of acts of childhood sexual abuse by the same abuser, then the discovery period under subsection (b) shall be computed from the date the person abused discovers or through the use of reasonable diligence should discover *both* (i) that the last act of childhood sexual abuse in the continuing series occurred and (ii) that the injury was caused by any act of childhood sexual abuse in the continuing series. *The fact that the person abused discovers or through the use of reasonable diligence should discover that the last act of childhood sexual abuse in the continuing series occurred is not, by itself, sufficient to start the discovery period under subsection (b). Knowledge of the abuse does not constitute discovery of the injury or the causal relationship between any later-discovered injury and the abuse.*

(e) This Section applies to actions pending on the effective date of this amendatory Act of 1990 as well as to actions commenced on or after that date. The changes made by this amendatory Act of 1993 shall apply only to actions commenced on or after the effective date of this amendatory Act of 1993. *The changes made by this amendatory Act of the 93rd General Assembly apply to actions pending on the effective date of this amendatory Act of the 93rd General Assembly as well as actions commenced on or after that date.[1]*

121. Determining whether there is a causal relation between the perception of

an event and subsequent adverse psychological, emotional or mentational changes

(hereinafter collectively denoted as psychological dysfunction) requires advanced study,

---

[1] Amendments to sections 13-202.2 effective July 24, 1993, both (1) changed the time period from bringing action from 2-5 years after discovery and (2) added clarifying language concerning discovery. The change in the time for bringing action-not pertinent here—is shown by strike through of the old number, with the new shown **bold**. Clarifying language is shown *italicized*.

training, experience and expertise in the forensic application of principles of normal and abnormal child, developmental and adult psychiatry and psychology, which knowledge and skills are not possessed by Plaintiff herein, nor by lay persons generally. This is so because:

- A. Psychological dysfunction may develop without the occurrence of any identifiable exogenous cause or trigger;

- B. Psychological dysfunction may be caused or precipitated in some persons as a consequence of perceptions of events while other persons, of similar age, background, education and experience exposed to the same event may experience little or no such change;

- C. A temporal relation between perception of an event and psychological dysfunctionis not a reliable indicator of causal relation; that is, some persons may experience onset of psychological dysfunction in close temporal relation to the perception of an event without a causal relation existing between the event and the development or onset of psychological dysfunction while, in other persons, psychological dysfunctioncaused by perception of an event may manifest after the lapse of considerable time; and,

- D. Plaintiff lacks the requisite study, training, experience and expertise to competently determine the cause(s) or origin(s) of the psychological and emotional injuries and damages he has sustained.

122. To the extent that the Defendants assert that Plaintiff's claims are barred by any statute of repose or limitations, such claims are denied in that any such application of law to bar Plaintiff's claims would be an unconstitutional denial of plaintiff's rights to due process and equal protection under the Constitution and laws of the United States of America and the State of Illinois.

## VOLUNTARY UNDERTAKING

123. That by adopting certain policies and ideals, the Roman Catholic Church

and its Bishops explicitly stated that the individual priests, bishops, churches and dioceses should offer individuals who have suffered abuse at the hands of priests some type of assistance, including, but not limited to, financial aid for counseling. Further, that ARCHDIOCESE OF ST. LOUIS subscribed to this doctrine.

124. That as a direct and proximate result of this promise, individuals who have suffered abuse by priests, including SHANE PERRY, came forward against the Defendants named above to tell their story and in the belief that ARCHDIOCESE OF ST. LOUIS would live up to its promise of help and financial aid.

125. That by making such promises and enticing individuals to come forward with their stories in the hopes of finding some lasting peace from the abuse they suffered, THE ARCHDIOCESE OF ST. LOUIS voluntarily assumed the responsibility and undertaking of providing for these individuals and defending against any and all lawsuits and or claims that were brought against it.

126. That such a voluntary undertaking waived any and all statute of limitations and/or statute of repose arguments that the Plaintiff's claim is not timely brought.

## FIRST COUNT
## ASSAULT AND BATTERY
### Shane Perry v. Robert Johnston

1-126. Plaintiff hereby repeats, realleges, and incorporates the preceding paragraphs 1-126 inclusive of this Complaint as though fully set forth *in haec verba*.

127. That the aforementioned events were unwanted sexual advances made upon the Plaintiff, SHANE PERRY, maliciously and willfully perpetrated by the Defendant, REV. JOHNSTON.

128. That the aforementioned events were not consented to by SHANE

36

PERRY, and said contacts constituted harmful and offensive contact of the Plaintiff.

129.   As a direct and proximate cause of the aforementioned conduct of the Defendant, REV. JOHNSTON, Plaintiff has sustained severe and permanent injuries to his physical and psychological health; further, Plaintiff has in the past and will in the future suffer severe pain and mental anguish; further, Plaintiff has since majority and will in the future spend and become obligated to spend large sums of money for doctor bills, psychological bills, hospital bills, and other medical and psychiatric attention in an effort to be cured and healed of his injuries; further, Plaintiff has in the past and will in the future lose time, wages, and profits which he would have otherwise earned or acquired; further, Plaintiff's earning capacity has been impaired; further, Plaintiff has in the past and will in the future be hindered, hampered, and prevented from carrying on his ordinary affairs and duties to the same extent and in the same manner he was able to do prior to his said injuries.

WHEREFORE, Plaintiff, SHANE PERRY, demands judgment against the Defendant, REV. JOHNSTON, in such sum in excess of $50,000.00, as will fully, fairly and adequately compensate him for injuries and damages sustained, together with costs of suit herein.

**PLAINTIFF DEMANDS TRIAL OF THIS CAUSE BY JURY**

**SECOND COUNT**
**NEGLIGENCE**
**Shane Perry v. Robert Johnston**

1-126. Plaintiff hereby repeats, realleges, and incorporates the preceding paragraphs 1-126 inclusive of this Complaint as though fully set forth *in haec verba*.

127.   Defendant, REV. JOHNSTON, was under a duty to exercise reasonable

care for the safety of children under his tutelage and guidance, including SHANE

PERRY; notwithstanding, Defendant REV. JOHNSTON was negligent in one or more of

the following ways:

a. REV. JOHNSTON manipulated the emotions of the minor Plaintiff by way of pre-sexual grooming and played upon the minor Plaintiff here in order to gain control and obedience over him, thus ensuring silence by the victim of the sexual assault and creating an environment of confusion, guilt, shame, and other emotional disorders so that REV. JOHNSTON could exploit the power imbalance created by the roles he assumed with his position;

b. REV. JOHNSTON negligently, carelessly, and improperly failed to recognize that his sexualization of the relationship between a moral leader and a minor child was a mishandling of the phenomena of counter-transference, and thus exploited the relationship with Plaintiff for his own personal gain.

128.    As a direct and proximate cause of the aforementioned conduct of the

Defendant, REV. JOHNSTON, Plaintiff has sustained severe and permanent injuries to

his physical and psychological health; further, Plaintiff has in the past and will in the

future suffer severe pain and mental anguish; further, Plaintiff has since majority and will

in the future spend and become obligated to spend large sums of money for doctor bills,

psychological bills, hospital bills, and other medical and psychiatric attention in an effort

to be cured and healed of his injuries; further, Plaintiff has in the past and will in the

future lose time, wages, and profits which he would have otherwise earned or acquired;

further, Plaintiff's earning capacity has been impaired; further, Plaintiff has in the past

and will in the future be hindered, hampered, and prevented from carrying on his ordinary

affairs and duties to the same extent and in the same manner he was able to do prior to his

said injuries.

WHEREFORE, Plaintiff, SHANE PERRY, demands judgment against the

Defendant, REV. JOHNSTON, in such sum in excess of $50,000.00, as will fully, fairly and adequately compensate him for injuries and damages sustained, together with costs of suit herein.

## PLAINTIFF DEMANDS TRIAL OF THIS CAUSE BY JURY

### THIRD COUNT
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### Shane Perry v. Robert Johnston

1-126. Plaintiff hereby repeats, realleges, and incorporates the preceding paragraphs 1-126 inclusive of this Complaint as though fully set forth *in haec verba*.

127. The conduct of REV. JOHNSTON, as more specifically set forth in preceding paragraphs 1-126 inclusive was outrageous and extreme and intended and substantially certain to inflict severe and enduring emotional and psychological distress and disturbance in a person or reasonable sensibility.

128. As a direct and proximate cause of the aforementioned conduct of the Defendant, REV. JOHNSTON, Plaintiff has sustained severe and permanent injuries to his physical and psychological health; further, Plaintiff has in the past and will in the future suffer severe pain and mental anguish; further, Plaintiff has since majority and will in the future spend and become obligated to spend large sums of money for doctor bills, psychological bills, hospital bills, and other medical and psychiatric attention in an effort to be cured and healed of his injuries; further, Plaintiff has in the past and will in the future lose time, wages, and profits which he would have otherwise earned or acquired; further, Plaintiff's earning capacity has been impaired; further, Plaintiff has in the past and will in the future be hindered, hampered, and prevented from carrying on his ordinary affairs and duties to the same extent and in the same manner he was able to do prior to his

said injuries.

WHEREFORE, Plaintiff, SHANE PERRY, demands judgment against the
Defendant, REV. JOHNSTON, in such sum in excess of $50,000.00, as will fully, fairly
and adequately compensate him for injuries and damages sustained, together with costs
of suit herein.

## PLAINTIFF DEMANDS TRIAL OF THIS CAUSE BY JURY

### FOURTH COUNT
### NEGLIGENT HIRING
### Shane Perry v. The Arch-Diocese of St. Louis

1-126. Plaintiff hereby repeats, realleges, and incorporates the preceding
paragraphs 1-126 inclusive of this Complaint as though fully set forth *in haec verba*.

127.    That each of the defendants were, at all times relevant herein, the agent,
servant, employee, partner, associate, joint venturer, co-participant, and/or principal of or
with each of the other remaining Defendants. Further, that at all times relevant to this
cause of action, that each Defendant was acting within the scope of such relationship with
the full knowledge, authority, and permission of each of the remaining Defendants.

128.    That from 1979 to 1982, SHANE PERRY was sexually molested by REV.
JOHNSTON. The actions taken by REV. JOHNSTON were within the scope of his
relationship with THE ARCHDIOCESE OF ST. LOUIS, in that they occurred or were
made possible by the relationship between the two. The above molestations constitute a
breach of duty owed to SHANE PERRY by THE ARCHDIOCESE OF ST. LOUIS, in
hiring REV. JOHNSTON, thereby providing the opportunity for these sexual assaults to
occur to SHANE PERRY.

129.    Further, that THE ARCHDIOCESE OF ST. LOUIS, with all that the

40

entity stands for, implied that REV. JOHNSTON was safe, would be a benefit to the advancement of their children's spiritual and religious lives, and would not pose a risk to the children associated with these groups.

130.     That the injuries suffered by the Plaintiff, SHANE PERRY, were proximately caused by the negligent hiring of REV. JOHNSTON. Further, that but for these negligent acts, SHANE PERRY would not have been subject to the abuse suffered at the hands of REV. JOHNSTON.

131.     That the Defendant, THE ARCHDIOCESE OF ST. LOUIS, was aware, or should have been aware of the dangerous sexual propensities of REV. JOHNSTON, yet, despite this knowledge, recklessly and carelessly hired REV. JOHNSTON to serve as a priest and spiritual leader for THE ARCHDIOCESE OF ST. LOUIS, with a complete and utter disregard for the safety, health and well-being of SHANE PERRY.

132.     That the Defendant, REV. JOHNSTON, possessed certain dangerous characteristics that made members of THE ARCHDIOCESE OF ST. LOUIS, particularly children, vulnerable to harm and injury, in that he possessed dangerous sexual propensities, including, but not limited to, pedophilia.

133.     As a direct and proximate cause of the aforementioned conduct of the Defendant, THE ARCHDIOCESE OF ST. LOUIS, Plaintiff has sustained severe and permanent injuries to his physical and psychological health; further, Plaintiff has in the past and will in the future suffer severe pain and mental anguish; further, Plaintiff has since majority and will in the future spend and become obligated to spend large sums of money for doctor bills, psychological bills, hospital bills, and other medical and psychiatric attention in an effort to be cured and healed of his injuries; further, Plaintiff

41

has in the past and will in the future lose time, wages, and profits which he would have otherwise earned or acquired; further, Plaintiff's earning capacity has been impaired; further, Plaintiff has in the past and will in the future be hindered, hampered, and prevented from carrying on his ordinary affairs and duties to the same extent and in the same manner he was able to do prior to his said injuries.

WHEREFORE, Plaintiff, SHANE PERRY, demands judgment against the Defendant, THE ARCHDIOCESE OF ST. LOUIS, in such sum in excess of $50,000.00, as will fully, fairly and adequately compensate him for injuries and damages sustained, together with costs of suit herein.

## PLAINTIFF DEMANDS TRIAL OF THIS CAUSE BY JURY

### FIFTH COUNT
### NEGLIGENT RETENTION/SUPERVISION
### Shane Perry v. The Arch-Diocese of St. Louis

1-126. Plaintiff hereby repeats, realleges, and incorporates the preceding paragraphs 1-126 inclusive of this Complaint as though fully set forth *in haec verba*.

127. That each of the defendants were, at all times relevant herein, the agent, servant, employee, partner, associate, joint venturer, co-participant, and/or principal of or with each of the other remaining Defendants. Further, that at all times relevant to this cause of action, that each Defendant was acting within the scope of such relationship with the full knowledge, authority, and permission of each of the remaining Defendants.

128. That from 1979 to 1982, SHANE PERRY was sexually molested by REV. JOHNSTON. The actions taken by REV. JOHNSTON were within the scope of his relationship with THE ARCHDIOCESE OF ST. LOUIS, in that they occurred or were made possible by the relationship between the two. The above molestations constitute a

42

breach of duty owed to SHANE PERRY by THE ARCHDIOCESE OF ST. LOUIS, in retaining REV. JOHNSTON, thereby providing the opportunity for these sexual assaults to occur to SHANE PERRY.

129. Further, that THE ARCHDIOCESE OF ST. LOUIS, with all that this entity stands for, implied that REV. JOHNSTON was safe, would be a benefit to the advancement of their children's spiritual and religious lives, and would not pose a risk to the children associated with these groups.

130. That the injuries suffered by the Plaintiff, SHANE PERRY, were proximately caused by the negligent retention and supervision of REV. JOHNSTON. Further, that but for these negligent acts, SHANE PERRY would not have been subject to the abuse suffered at the hands of REV. JOHNSTON.

131. That the Defendant, THE ARCHDIOCESE OF ST. LOUIS, was aware, or should have been aware of the dangerous sexual propensities of REV. JOHNSTON, yet, despite this knowledge, recklessly and carelessly retained REV. JOHNSTON in his positions as a priest and spiritual leader for THE ARCHDIOCESE OF ST. LOUIS, with a complete and utter disregard for the safety, health and well-being of SHANE PERRY.

132. That the Defendant, REV. JOHNSTON, possessed certain dangerous characteristics that made members of THE ARCHDIOCESE OF ST. LOUIS, particularly children, vulnerable to harm and injury, in that he possessed dangerous sexual propensities, including, but not limited to, pedophilia.

133. That THE ARCHDIOCESE OF ST. LOUIS was under a duty of care to properly supervise REV. JOHNSTON, yet despite this duty, allowed REV. JOHNSTON to commit criminal acts while in the employment and care, and, while at all times, acting

as an agent, employee, and/or servant for THE ARCHDIOCESE OF ST. LOUIS.

134. As a direct and proximate cause of the aforementioned conduct of the Defendant, THE ARCHDIOCESE OF ST. LOUIS, Plaintiff has sustained severe and permanent injuries to his physical and psychological health; further, Plaintiff has in the past and will in the future suffer severe pain and mental anguish; further, Plaintiff has since majority and will in the future spend and become obligated to spend large sums of money for doctor bills, psychological bills, hospital bills, and other medical and psychiatric attention in an effort to be cured and healed of his injuries; further, Plaintiff has in the past and will in the future lose time, wages, and profits which he would have otherwise earned or acquired; further, Plaintiff's earning capacity has been impaired; further, Plaintiff has in the past and will in the future be hindered, hampered, and prevented from carrying on his ordinary affairs and duties to the same extent and in the same manner he was able to do prior to his said injuries.

WHEREFORE, Plaintiff, SHANE PERRY, demands judgment against the Defendant, THE ARCHDIOCESE OF ST. LOUIS, in such sum in excess of $50,000.00, as will fully, fairly and adequately compensate him for injuries and damages sustained, together with costs of suit herein.

**PLAINTIFF DEMANDS TRIAL OF THIS CAUSE BY JURY**

### SIXTH COUNT
### NEGLIGENT ENTRUSTMENT/BREACH OF
### FIDUCIARY DUTY/RESPONDEAT SUPERIOR
**Shane Perry v. The Arch-Diocese of St. Louis**

1-126. Plaintiff hereby repeats, realleges, and incorporates the preceding paragraphs 1-126 inclusive of this Complaint as though fully set forth *in haec verba*.

127. That each of the defendants were, at all times relevant herein, the agent, servant, employee, partner, associate, joint venturer, co-participant, and/or principal of or with each of the other remaining Defendants. Further, that at all times relevant to this cause of action, that each Defendant was acting within the scope of such relationship with the full knowledge, authority, and permission of each of the remaining Defendants.

128. At all times material to Plaintiff's Complaint, Defendant, REV. JOHNSTON, occupied a special and fiduciary relationship between himself and the Co-Defendant, THE ARCHDIOCESE OF ST. LOUIS.

129. Defendant, REV. JOHNSTON, engaged in the negligent acts of sexual deviancy more fully set forth above. The original contact of REV. JOHNSTON with Plaintiff came as a result of Plaintiff being involved in activities and functions provided by THE ARCHDIOCESE OF ST. LOUIS. These acts by the Defendant were perpetrated upon the Plaintiff, SHANE PERRY, by REV. JOHNSTON, while in the performance of his duties and in the course of his employment as a priest, religious leader, teacher, and other roles consistent with his employment by THE ARCHDIOCESE OF ST. LOUIS, and it was the accessibility of the Plaintiff as a member of these group activities that led to the sexual assault committed by REV. JOHNSTON.

130. Upon information and belief after learning of Defendant, REV. JOHNSTON'S, criminal conduct, Defendant, ARCHDIOCESE OF ST. LOUIS, ratified his conduct by failing to report him to law enforcement authorities, failing to notify police, parishioners, or plaintiff's parents or the laity. Instead of disciplining REV. JOHNSTON, ARCHDIOCESE assigned REV. JOHNSTON to another parish. Defendant, ARCHDIOCESE OF ST. LOUIS'S conduct explicitly communicated to

Plaintiff, SHANE PERRY, that the Defendant, REV. JOHNSTON'S, conduct was proper, thereby reinforcing by Diocesan silence REV. JOHNSTON'S prior representations that REV. JOHNSTON'S conduct was innocent and beneficial and, accordingly, non-actionable. Defendants knew and intended their actions would mislead Plaintiff, SHANE PERRY, and prevent him from discovering his injuries, his complaints and possible other complaints and ultimately exacerbate his emotional distress and trauma.

131.    As a direct and proximate cause of the aforementioned conduct of the Defendant, THE ARCHDIOCESE OF ST. LOUIS, Plaintiff has sustained severe and permanent injuries to his physical and psychological health; further, Plaintiff has in the past and will in the future suffer severe pain and mental anguish; further, Plaintiff has since majority and will in the future spend and become obligated to spend large sums of money for doctor bills, psychological bills, hospital bills, and other medical and psychiatric attention in an effort to be cured and healed of his injuries; further, Plaintiff has in the past and will in the future lose time, wages, and profits which he would have otherwise earned or acquired; further, Plaintiff's earning capacity has been impaired; further, Plaintiff has in the past and will in the future be hindered, hampered, and prevented from carrying on his ordinary affairs and duties to the same extent and in the same manner he was able to do prior to his said injuries.

WHEREFORE, Plaintiff, SHANE PERRY, demands judgment against the Defendant, THE ARCHDIOCESE OF ST. LOUIS, in such sum in excess of $50,000.00, as will fully, fairly and adequately compensate him for injuries and damages sustained, together with costs of suit herein.

PLAINTIFF DEMANDS TRIAL OF THIS CAUSE BY JURY

SHANE PERRY, Plaintiff

BY: _____
One of His Attorneys

Timothy J. Freiberg, Esq.
LAW OFFICES OF FREDERIC W. NESSLER & ASSOCIATES, LTD.
536 North Bruns Lane, Suite One
Springfield, IL 62702
(800)727-8010
(217)698-0202
(217)698-0203 (fax)

## AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222

The undersigned hereby certifies that the total money damages sought in this action exceeds Fifty Thousand Dollars ($50,000.00).

THE LAW OFFICES OF FREDERIC W. NESSLER

Timothy J. Freiberg
**THE LAW OFFICES OF FREDERIC W. NESSLER & ASSOCIATES**
**536 N. Bruns Lane, Suite One**
**Springfield, IL 62702**
**217-698-0202**
**217-698-0203 Fax**

## PRAECIPE FOR SUMMONS

Plaintiff requests that the Clerk of this Court of Madison County issue a Summons to be served upon:

Robert Johnston
Regin Cleri (location)
10 Archbishop May Drive
St. Louis, Missouri 63119-5738

Archdiocese of St. Louis
C/O: Archbishop Raymond L. Burke
The Catholic Center
4445 Lindell Blvd.
St. Louis, MO 63108

Said Summons returnable as provided by law.